Filed 10/21/15  P. v. Hoffman CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B255536 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA097198) |
| v. | |
| STEPHEN DOUGLAS HOFFMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas C. Falls, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Susan Sullivan Pithey and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Stephen Douglas Hoffman appeals from his judgment of conviction of second degree murder (Pen. Code,[1] § 187, subd. (a)) and assault causing the death of a child under the age of eight (§ 273ab, subd. (a)). Hoffman contends that the trial court prejudicially erred in failing to instruct the jury on witness testimony with CALJIC Nos. 2.20 and 2.27, instructing the jury on the fabrication of evidence with CALJIC No. 2.04, and instructing the jury on evidence of other child abuse offenses with modified versions of CALJIC Nos. 2.50.04 and 9.37. He also claims that the trial court erred in denying his motion for a new trial based on newly discovered evidence. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

In an information filed by the Los Angeles County District Attorney, Hoffman was charged with the murder of a child, Malaikye ("Kye") Payne, in violation of section 187, subdivision (a). Hoffman also was charged with the assault of a child under the age of eight resulting in his death in violation of section 273ab, subdivision (a). Following Hoffman's plea of not guilty to each count, the case was tried to a jury.

### II. The Prosecution Evidence

#### A. Hoffman's Relationship with Kye and His Mother[2]

Kye was born on March 29, 2010 to Jazmin Payne. Jazmin ended her relationship with Kye's biological father a few months after the birth and did not have any regular contact with him. In or about January 2011, Jazmin met Hoffman while they were both working at Disneyland; the two began dating soon thereafter. In March 2011, Jazmin introduced Hoffman to her son. Hoffman got along well with Kye from the beginning,

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

[2] For clarity and convenience, and not out of disrespect, we shall refer to Kye and other members of the Payne family by their first names.

and he soon assumed the role of a father in the child's life. Kye became very attached to Hoffman and called him "Dada."

Jazmin and Kye initially lived with Jazmin's mother, Kimberly Payne, and her stepfather, David Payne. In April 2011, Jazmin and Kye moved into the home of her biological father. Two months later, in June 2011, Hoffman also moved into the home. Jazmin's father occupied one bedroom of the home, and Hoffman, Jazmin, and Kye occupied the other bedroom. Kye slept in a toddler bed with a safety guard that was approximately one foot off the ground, while Hoffman and Jazmin slept in an adult-sized bed that was approximately three feet off the ground. The bedroom floor was carpeted.

In or about June 2011, Jazmin began working nights from 10:30 p.m. to 6:00 a.m. Kimberly and her husband would babysit Kye a few nights a week, and Hoffman would care for Kye on his own the other three to four nights that Jazmin was at work. Jazmin's new work schedule seemed to disrupt Kye's sleep schedule, and he began waking up more frequently during the night. Jazmin also had difficulty putting Kye to bed at night and it could take up to two hours for the child to fall asleep. Hoffman, on the other hand, was able to get Kye to sleep without any trouble. Jazmin felt that Hoffman was more patient with Kye than she was, and he was able to calm the child down at times when she could not.

After Hoffman moved in, Jazmin asked him to help discipline Kye by lightly spanking his hand or swatting his buttocks over the diaper when he misbehaved. Brittany Adams, Jazmin's close friend from high school, saw Hoffman spank Kye on the buttocks four or five times when she was visiting their home. On those occasions, Jazmin asked Hoffman to discipline Kye because the child was not listening to her and she did not want to discipline him herself. There were two or three times that Adams saw Hoffman spank Kye so hard that the child's knees buckled.

### B. Kye's Prior Illnesses and Injuries

Kye was generally a healthy baby. He was crawling at eight months, walking at 10 months, and running at 12 months. He had a brief seizure upon awakening from a nap when he was 10 months old, and he had a second seizure after a nap when he was 11 months old. Following some testing, Kye's doctor ruled out a seizure disorder. Kye also had hemangioma, a small benign mass of blood vessels, surgically removed from his scalp when he was 12 months old. Kye's doctor did not order any additional testing or treatment for these issues.

By the age of sixteen months, Kye was a rambunctious little boy who loved to run. At times, he would fall and get small bruises, such as bruises from skidding on his knees; however, he would get right back up and start running again. There were a few times when Kye hit his head on an object and sustained a bruise on his forehead while in the care of Jazmin's family. On those occasions, Kye would simply get back up and resume playing. Because of Kye's frequent bruising, Jazmin asked to have him tested for anemia. Kye's doctor agreed to order the test, but Jazmin never took Kye to have the test performed because she was busy with work. No doctor ever told Jazmin that Kye bruised easily or might be anemic.

On one occasion in the summer of 2011, Jazmine observed three small round bruises on the bottom of Kye's thigh as she was changing his diaper. Jazmin's friend, Adams, also saw the bruises on Kye's thigh. Jazmin told Adams that the bruises were the result of Hoffman spanking Kye too hard and that she was going to ask him to stop the spankings. On another occasion, Jazmin noticed that Kye had a pair of long purple bruises on the side of his face that extended from his chin to his eye. Hoffman told Jazmin that Kye had fallen off the couch and onto a dog bone while they were playing in the living room and she was asleep in the bedroom. A few weeks later, in July 2011, Jazmin again left Kye in Hoffman's care while she slept in the other room. Jazmin later saw that Kye had two black eyes and a cut on his lip. Hoffman told Jazmin that he had fallen asleep with Kye on the couch and that the child had accidentally rolled off the

4

couch and landed on his face. At the time, Jazmin did not consider any of these injuries to be suspicious in nature.

On the night of August 11, 2011, Jazmin's mother, Kimberly, and her stepfather, David, babysat Kye at their home. Kye woke up in the middle of the night and refused to go back to sleep. Kimberly tried to get Kye back to sleep by holding him, rocking him, and singing to him, but he stayed awake for several hours. Later that day, August 12, 2011, Jazmine picked Kye up from Kimberly's house. When Jazmin arrived, Kye went outside to greet her and fell on a porch step. Kye hit his forehead on the grass, but he immediately got back up and did not appear to be hurt.

### C. Kye's Death While In Hoffman's Care

On the night of August 12, 2011, Jazmin gave Kye a bath before putting him to bed. At the time, Kye had a small scrape on the left side of his head from falling on a cardboard book a few nights earlier. He also had a bruise on the middle of his forehead from running into a chair at his great grandmother's house earlier in the week. He did not have any other bruises on his face or head, and the wounds he had appeared to be healing. As Jazmin was bathing Kye, he slipped in the tub and bumped the back of his head, but he did not seem to be hurt. After putting Kye to bed, Jasmin got ready for work.

Shortly before 10:00 p.m., Jazmin's friend, Nicole Morones, arrived to babysit Kye while Jazmin and Hoffman were both at work. When Jazmin left for work around 10:30 p.m., Kye was asleep on his back on a toddler-sized sofa bed in the living room. Kye woke up once while Morones was babysitting, but went back to sleep when she gave him a pacifier. Kye was breathing normally as he slept and Morones did not observe any unusual marks on his face or head. Around 1:00 a.m., Morones's boyfriend stopped by to keep her company as she babysat. When Hoffman arrived home a few minutes later, he picked up Kye from the sofa bed and carried him into the bedroom. Kye woke up at that time, but he did not cry and appeared to be okay. Morones and her boyfriend then left.

At around 2:30 a.m., Hoffman sent Jazmin a text message that Kye had fallen off his toddler bed, along with a photograph of a bruise that was forming on Kye's forehead.

5

Jazmin immediately called Hoffman and asked him how hard Kye had fallen. Hoffman told her that Kye had fallen off the toddler bed and landed on a toy alligator, but he was unsure how hard the fall was because he had been dozing off himself. Jazmin told Hoffman to keep Kye awake in case he had a concussion, but Hoffman said that Kye was already asleep. When Jazmin called back an hour later to check on Kye, Hoffman assured her that the child was fine.

Jazmin returned home from work around 6:00 a.m. At that time, Kye was asleep on his back in his toddler bed and appeared to be fine. After giving Kye a kiss on his forehead, Jazmin went to sleep. Later that morning, Jazmin heard Hoffman trying to wake up Kye by calling his name. Hoffman told Jazmin that Kye was not waking up. Jazmin also tried calling Kye's name and shaking him a bit, but he did not respond. When Jazmin picked Kye up from his bed, she realized that his body was limp and that he was struggling to breathe. She immediately called 911.

Azusa Police Officer John Wachowski was the first officer to respond to the scene. He arrived at the home shortly after 9:30 a.m. and was met at the front door by Hoffman. After entering the bedroom, Officer Wachowski saw Kye lying motionless on an adult-sized bed. He had multiple bruises on his forehead. He also had a small purple bruise on the left side of his neck just below the jaw line, and small bruises along his left ear. There was dried blood on Kye's mouth and tongue and blood stains on the bed where he was lying. Kye had a pulse at that time, but was unresponsive.

Officer Wachowski carried Kye outside as emergency medical personnel arrived on the scene. Los Angeles County Firefighter/Paramedic Matthew Heard immediately began administering oxygen to Kye, who was limp and not breathing. While examining Kye, Paramedic Heard observed that the child's eyes were closed and his pupils were fixed and dilated. His heart rate was elevated and he had substantial bruising over his entire forehead. Paramedic Heard believed that Kye's injuries were consistent with head trauma, but were not consistent with a fall from a foot-high toddler bed onto a plastic toy, or with a fall from an adult-sized bed onto a carpeted floor. Kye was transported by ambulance to Los Angeles County USC Medical Center.

6

Based on the severity of his injuries, Kye was admitted to the pediatric intensive care unit on the morning of August 13, 2011. At the time of his admission, Kye had multiple bruises of varying ages on his head and body. He had bruises on both sides of his face and head that were only a few hours old. A CAT scan of his brain showed multiple subdural hemorrhages on both sides of his head over a large area of his brain. An eye examination revealed numerous retinal hemorrhages in both eyes. Kye was unresponsive, immobile, and unable to breathe on his own. He had multiple system failure and no brain function.

On August 15, 2011, Kye was declared brain dead. When the family gathered to say their goodbyes, Hoffman initially refused Jazmin's requests to see Kye one last time. Hoffman eventually agreed and approached Kye's bedside with Jazmin, but he would not look at Kye and showed no emotion.

### D.     The Police Investigation

Los Angeles County Sheriff's Detective Ronald Duval was the lead investigating officer on the case. On the afternoon of August 13, 2011, Detective Duval interviewed Jazmin and Hoffman at the hospital. Hoffman told the detective that he and Kye had been asleep when he heard a thud and then saw that Kye had fallen off his toddler bed and landed on a toy. Hoffman also said that, after helping Kye back into his bed, he collected all of the toys that were on the floor and put them in a toy chest next to the bed.

Later that day, during a search of the house, Detective Duval saw a green plastic alligator on the floor beside Kye's toddler bed. When Hoffman arrived at the house later that night, Detective Duval conducted a second interview with him. Hoffman told the detective that he had placed the toy alligator on the floor that morning to show the officers who questioned him at the scene how the fall occurred. Hoffman maintained that Kye had fallen off his toddler bed onto the toy.

On August 19, 2011, an autopsy was performed on Kye. The autopsy showed that Kye had 20 to 21 bruises that had been recently inflicted. He had numerous red or purple bruises on his head and face, including both sides of the forehead, the right chin, the right

7

eye, the left ear, and the tongue. He also had several oval-shaped purple bruises along the left chin consistent with finger marks. In addition to 19 recently inflicted bruises on his head, Kye had two older injuries – a scrape on the left forehead and a bruise on the middle of the forehead – that were both healing. The autopsy further showed several large subcutaneous hemorrhages underneath the scalp on both sides of the frontal skull, and retinal hemorrhaging in both eyes. Kye did not have a skull fracture or any injury to the back of the head or the spine. Some hemorrhaging was observed at the C-3 vertebrae, but the medical examiner did not find any evidence of a spinal cord injury and attributed the blood in that area to the child's brain injuries and the autopsy procedure. The medical examiner also did not find any evidence that Kye suffered from a pre-existing seizure disorder or blood clotting disorder.

According to the medical examiner, Kye's injuries were not consistent with a child falling off a one-foot high bed onto a plastic toy or even falling headfirst off a three-foot high bed onto a carpeted floor. Kye's injuries were consistent with force being applied to the head multiple times, such as a repeated punching of the head with a fist or striking of the head against another object. Even if emergency medical treatment had been provided to Kye as soon as the injuries occurred, it is unlikely that he would have survived such devastating injuries. The medical examiner determined the cause of death to be multiple blunt force injuries to the head inflicted by another.

On August 21, 2011, Detective Duval interviewed Hoffman a third time when he and Jazmin came to the sheriff's station to retrieve their cell phones. Hoffman continued to claim that Kye had fallen off his bed and landed on a toy alligator. Detective Duval told Hoffman that Kye had suffered multiple head injuries that were not consistent with a single fall from a toddler bed onto a toy or carpeted floor. Hoffman did not offer any other explanation for Kye's injuries at that time.

On October 4, 2011, Detective Duval conducted a fourth interview with Hoffman at the sheriff's station while Jazmin waited outside. During the first part of the interview, Hoffman repeated his account that Kye was injured when he fell off his toddler bed onto the toy alligator. At some point, Detective Duval stopped the interview and asked Jazmin

8

to speak with Hoffman alone. Detective Duval told Jazmin that Hoffman's story was not consistent with the injuries that Kye had suffered and she deserved to know the truth. He also told her that she would be investigated by the district attorney's office in connection with the case.

Once Jazmin was alone with Hoffman in the interview room, she dropped to her knees and pleaded with him to tell her what happened to Kye. Hoffman told Jazmin that he had been playing with Kye on their bed and that Kye had fallen off the bed as he was jumping. Hoffman also told her that he had lied before about how the fall occurred because he was afraid. Jazmin did not ask Hoffman for any further explanation and she believed at that time that he was telling her the truth.

After Detective Duval returned to the interview room, Hoffman recounted this new version of events in more detail. According to Hoffman, after the babysitter left, he was playing with Kye on the adult-sized bed because the child had woken up and did not want to go back to sleep. Hoffman was sitting on his knees and bouncing Kye up and down on the bed. As Kye was bouncing, he accidentally fell headfirst off the bed and landed awkwardly on the back of his head onto the carpeted floor. Hoffman did not see whether Kye hit any object as he was falling and found him face up on the floor next to the bed. Kye screamed when he fell, but then became quiet and drowsy. Hoffman put Kye back into his bed and saw a red mark forming on the child's head. Hoffman decided to send a photograph of the mark to Jazmin, along with a text message stating that Kye had fallen off his toddler bed. Hoffman did not tell Jazmin the truth then because he was afraid of being blamed for the fall and he thought that Kye would be fine in the morning.

Detective Duval also conducted interviews with Jazmin's family and friends. All of the witnesses that were interviewed commented that Kye was clumsy and easily bruised himself. They also consistently stated that Kye was a happy child.

9

### E.    Hoffman's Behavior After Kye's Death

In the days following Kye's death, there were times when both Hoffman and Jazmin seemed detached from the situation. Jazmin was not involved in arranging Kye's funeral, and instead left the responsibility to Kimberly and her friend, Heidi Marshman. On one occasion, Marchman noticed that both Hoffman and Jazmin appeared to be more concerned about retrieving their cell phones, which had been confiscated by the police, than helping with the funeral arrangements. Marchman also observed that Hoffman did not interact much with Jazmin's family or friends and instead retreated to the bedroom holding a stuffed animal that had belonged to Kye.

During Kye's funeral, Hoffman generally stayed by Jazmin's side but appeared expressionless. At a reception held after the funeral, however, Hoffman became angry at Jazmin because she was spending time with her friends rather than with him. Hoffman told Jazmin that she should not be with her friends trying to forget about what had happened. He also said to Jazmin, "This is about me today."

In the months following Kye's death, Jazmin believed that Hoffman was telling her the truth about how Kye's injuries occurred. She believed Hoffman's initial account that Kye had fallen off his toddler bed onto a toy alligator, as well as his later account that the child had fallen off the adult-sized bed onto the carpeted floor. Jazmin first began to question the veracity of Hoffman's version of events during a conversation between Hoffman and her parents. As Jazmin was holding Hoffman's hand, her father said to him, "If it was an accident, come clean. We'll still support you." In response, Hoffman squeezed Jazmin's hand tightly and she could feel his heart racing. Although Jazmin began to have doubts about Hoffman's story at that time, she still loved him and wanted to believe that Kye's death was an accident. She also was afraid that, if Hoffman had hurt her son, then he could hurt her as well.

One day in January 2012, Hoffman sent a text message to Jazmin, along with a photograph of a cut across his wrist. He told Jazmin in the message that she was the cause of his actions. Hoffman and Jazmin were still living together at that time, but they were having ongoing problems in their relationship. Jazmin called Hoffman's family

10

when she received the text and photograph, and they in turn contacted the police. A few hours later, Jazmin returned home and found a letter on the computer that Hoffman had written to his parents, which suggested that he had intended to harm himself. Hoffman later told Jazmin that he had cut his wrists because she was seeing someone else and their relationship was ending, but he made no reference to Kye. Because Jazmin still loved Hoffman, she continued to believe that Kye's death was an accident through the July 2012 preliminary hearing.

### F. The Prosecution's Medical Experts

Dr. Cynthia Stotts, a pediatric hospitalist at Los Angeles County USC Medical Center, was the attending physician who treated Kye in the intensive care unit. Dr. Stotts had treated hundreds of toddlers with head trauma and considered the injuries suffered by Kye to be among the most severe she had ever seen. In Dr. Stotts's opinion, Kye's injuries were caused by severe forces and were not consistent with a one-foot fall onto a plastic toy or a three-foot headfirst dive onto a carpeted floor. Kye's injuries were consistent with a child being struck multiple times on both sides of his head rather than suffering a single massive blow. None of the actions taken by the medical personnel who treated Kye would have caused his severe head trauma. Even if Kye had received emergency medical care as soon as he was injured, it is unclear that he could have survived because his injuries were devastating.

Dr. Jeffrey Johnson was the director of the pediatric intensive care unit at Los Angeles County USC Medical Center and Dr. Stotts's clinical supervisor. Dr. Johnson had treated over a hundred toddlers with severe head trauma, and oversaw the medical treatment of Kye when the child was in the intensive care unit. Kye had substantial bruising to his head and face when he was admitted to the hospital, and there was no indication that he suffered any secondary injury while being treated. In Dr. Johnson's opinion, the hemorrhaging observed on both sides of Kye's brain was consistent with non-accidental or abusive head trauma, caused by a rapid movement of the head in a back and forth manner. The multiple hemorrhages found in Kye's retinas also were consistent

11

with repetitive head trauma. Kye's injuries were not consistent with a fall from a three-foot bed onto a carpeted floor or even a single severe fall from a higher distance. A single severe fall or other serious accident was more likely to result in a focal injury at the point of impact than the diffuse pattern of injury observed in Kye. The laboratory tests that were performed on Kye upon his admission to the hospital showed blood clotting abnormalities, but these types of clotting issues were a common byproduct of severe head trauma and were not indicative of a pre-existing condition. There was no evidence in Kye's medical history that he had a pre-existing clotting disorder that could have caused or contributed to the severity of his injuries.

Dr. Donald Minckler was an eye pathologist at the University of California at Irvine. He also performed work for the Los Angeles County Coroner's Office and would examine the eyes of deceased babies in suspected cases of abusive head trauma or shaken baby syndrome. Following the autopsy, Dr. Minckler examined Kye's eyes and found that Kye had extensive hemorrhaging in both retinas. There was also evidence of retinal detachment in both eyes and a completely detached retina in the left eye. Dr. Minckler explained that there was a strong correlation between abusive head trauma and retinal hemorrhaging, and that a retinal detachment usually was caused by significant blunt force such as a punch to the face or head. Based on the damage to Kye's retinas, Dr. Minckler suspected that the child's head was forcibly shaken, but also noted that shaking alone probably would not result in a retinal detachment. In Dr. Minckler's opinion, the retinal damage in Kye's eyes was not consistent with a fall from a height of one to three feet onto a toy or carpeted floor, nor could it be explained by a blood clotting disorder. Instead, Kye's eye injuries were consistent with non-accidental head trauma, such as a child being punched with a fist on both sides of the head and forcibly shaken.

Dr. Carol Berkowitz, a pediatrician specializing in child abuse, reviewed the medical records concerning Kye's death. Based on her review, Dr. Berkowitz found that Kye had suffered multiple bruises on his face and head, multiple subdural hemorrhages in his skull, and massive retinal hemorrhaging in both eyes. Kye's severe head injuries caused his brain to swell, which deprived him of oxygen and rendered him unable to

breathe. Kye's abnormal clotting tests while in the hospital were consistent with severe head trauma and were not indicative of a pre-existing clotting disorder. There also was no evidence that Kye suffered a spinal cord injury. In Dr. Berkowitz's opinion, the cause of death was abusive head trauma. Kye's injuries were not consistent with a one to three foot fall onto a toy or carpeted floor. While a short distance fall could result in a focal head injury at the area of impact, it would not cause multiple bruises and hemorrhages on both sides of the head, multiple retinal hemorrhages, or a retinal detachment. The external bruising on Kye's face and head was consistent with his head being repeatedly struck, and the retinal hemorrhaging in his eyes was consistent with the child being forcibly shaken. Kye's injuries could have been caused by someone punching his head or slamming his head into an object, but not by the medical treatment that he received at the scene or in the hospital.

### III. The Defense Evidence

#### A. Hoffman's Relationship with Jazmin and Kye

Michael Adkins, Jazmin's father, was called as a witness for the defense. Adkins testified that Kye was a rambunctious little boy who liked to run around the house. There were times when Kye ran into objects such as walls or furniture, but he would get back up and continue running. When Jazmin began working at night, Hoffman spent more time taking care of Kye on his own. Hoffman would watch Kye at night after he returned home from work between 11:00 p.m. and 2:00 a.m. He also would watch Kye in the morning while Jazmin was asleep. Adkins recalled one occasion where Hoffman showed him a mark that Kye had on his mouth after falling off the couch.

Hoffman's grandmother and cousin testified on his behalf. His grandmother was a registered nurse in maternal child care. She first met Jazmin and Kye in May 2011 when Hoffman brought them to her home for a visit. As Kye ran around the home, she noticed that he kept slamming his head into the wall and the dining room table. Kye would whine for a moment when he hit his head and then would get back up and start running again. During Kye's subsequent visits to the home, she also observed that Kye often

13

pinched himself on his neck and upper chest, leaving small marks on his skin. Hoffman's grandmother and cousin went to the hospital as soon as they learned that Kye had been injured. They recalled that Hoffman was distraught at the hospital and cried on his mother's shoulder when his family arrived. He was also visibly upset at the funeral services for Kye and fought back tears. Hoffman spent a lot of his time at the hospital and the funeral comforting and supporting Jazmin.

### B. The Defense Medical Expert

Dr. Ronald Gabriel was a pediatric neurologist specializing in the diagnosis and treatment of brain and spinal cord conditions in children. According to Dr. Gabriel, medical research has shown that retinal hemorrhages and significant subdural hematomas are not caused by shaking alone, but also require impact. As a result, the condition previously known as "shaken baby syndrome" has been reclassified as "shaken impact syndrome" in the medical community. Research also has shown that falls of less than five or six feet can produce fatal injuries in children depending on the nature of the fall. In Dr. Gabriel's opinion, it was possible for a short fall to cause retinal hemorrhaging and even retinal detachment in children.

Dr. Gabriel reviewed Kye's complete medical history. Based on the laboratory tests that were performed upon Kye's admission to the hospital, Dr. Gabriel opined that Kye had a blood clotting disorder that contributed to the amount of bruising on his skin, hemorrhaging in his retinas, and bleeding over the surface of his brain. Dr. Gabriel noted that his opinion that Kye had a clotting disorder was consistent with child's history of frequent bruising as reported by his family. Dr. Gabriel further opined that Kye suffered an impact injury to the front right side of his head that caused significant bruising in that area and led to the retinal hemorrhaging and intracranial hemorrhaging in both the right and left sides of the brain. Dr. Gabriel explained that when there is an impact injury to the head, a clotting disorder can cause the skin to bruise more easily and can make intracranial and retinal bleeding more significant. Although Kye's bruising and bleeding originated from an impact injury, his clotting disorder made such bruising and bleeding

14

worse than it otherwise would have been. Additionally, due to the clotting disorder, the medical treatment that Kye received at the scene or in the hospital could have caused some of the bruising that was observed on his head and face, including the long finger-like bruises on his left chin.

Dr. Gabriel concluded that the cause of death was a spinal cord injury at the C-3 vertebrae which deprived Kye of oxygen to his brain. The damage to the spinal cord was evidenced by the hemorrhaging found in the C-3 vertebrae, and there was no indication that such hemorrhaging was a post-mortem artifact of the autopsy. Kye's injuries were consistent with a child jumping and falling headfirst from a three-foot bed, although they were not consistent with a shorter fall from a one-foot bed. Dr. Gabriel could not opine whether Kye's death was intentional or accidental. However, he strongly disagreed with the medical examiner's conclusion that the cause of death was multiple blunt force head injuries. While Dr. Gabriel found that Kye suffered some type of blunt force impact that caused a spinal cord injury, he disagreed with the medical examiner's opinion that Kye had 19 separate impact injuries to the head and had been beaten to death.

Dr. Gabriel did not believe that the prior seizures or hemangioma that Kye had during his first year of life were related to his death. He also did not believe that any of the bruises or scrapes that Kye sustained in the days or weeks before his hospitalization were contributing factors in his fatal injuries. Instead, the injuries that caused Kye's death occurred about six to eight hours prior to his admission to the hospital. Dr. Gabriel opined that, if Kye had received immediate medical treatment for his injuries, there was a good chance that he would have survived.

## IV.    Verdict and Sentencing

At the conclusion of the trial, the jury found Hoffman guilty of second degree murder and assault causing the death of a child. Following the denial of his motion for a new trial, Hoffman was sentenced to a total term of 25 years to life in state prison. Hoffman filed a timely notice of appeal from his judgment of conviction.

15

**DISCUSSION**

## I. Alleged Instructional Error

On appeal, Hoffman contends the trial court committed four instances of prejudicial instructional error. He specifically claims the trial court erred in (1) failing to instruct the jury on witness credibility with CALJIC No. 2.20, (2) failing to instruct the jury on the testimony of a single witness with CALJIC No. 2.27, (3) instructing the jury on the fabrication of evidence with CALJIC No. 2.04, and (4) instructing the jury on evidence of other child abuse offenses with modified versions of CALJIC Nos. 2.50.04 and 9.37.

### A. Standard of Review

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]" (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) "An instructional error that improperly describes or omits an element of the crime from the jury's consideration is subject to the 'harmless error' standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18, 24," which requires reversal unless it "appears beyond a reasonable doubt that the instructional error did not contribute to the jury's verdict." (*People v. Lamas* (2007) 42 Cal.4th 516, 526.) However, "'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. . . . "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" [Citation.]'" (*People v. Huggins* (2006) 38 Cal.4th 175, 192.) "'"[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836].' [Citations] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citations.]" (*People v. Beltran* (2013) 56 Cal.4th

935, 955.) The arguments of counsel also must be considered in "assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

### B. Failure to Instruct the Jury with CALJIC No. 2.20

Hoffman first claims that the trial court erred in failing to sua sponte instruct the jury on witness credibility with CALJIC No. 2.20. The Attorney General concedes the instruction should have been given, but contends that the failure to do so was harmless.

CALJIC No. 2.20 instructs the jurors that they are "the sole judges of the believability of a witness and the weight to be given the testimony of each witness," and identifies certain factors that the jurors may consider as having "a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness." The instruction comports with section 1127, which requires the court to "inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses." (§ 1127.) The trial court has a sua sponte duty to instruct the jury on witness credibility with CALJIC No. 2.20 or its equivalent. (*People v. Horning* (2004) 34 Cal.4th 871, 910 ["court should give the substance of CALJIC No. 2.20 in every criminal case, although it may omit factors that are inapplicable under the evidence"]; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883 ["the substance of the instruction set forth as CALJIC No. 2.20 should . . . always be given"].)

In this case, we conclude that the trial court erred in failing to give CALJIC No. 2.20 or an equivalent instruction, but the error was harmless. When the record is considered as a whole, the other instructions given by the trial court, along with the arguments of counsel, provided sufficient guidance to the jury on how to assess the credibility of the witnesses. CALJIC No. 0.50 informed the jurors that they "must determine the facts from the evidence received in the trial," and that they "are the judges of the believability of witnesses." CALJIC No. 2.21.1 advised that "[d]iscrepancies in a witness's testimony or between a witness's testimony and that of other witnesses . . . do not necessarily mean that a witness should be discredited," and that the jury "should consider whether a discrepancy relates to an important matter or only to something

17

trivial." CALJIC No. 2.22 instructed the jury that, in weighing conflicting testimony, it "must not decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides," but instead must consider "the convincing force of the evidence." CALJIC No. 2.13 explained that the jury could consider prior inconsistent or consistent statements made by a witness "not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion." CALJIC No. 2.81 told the jury that "[i]n determining the weight to be given to an opinion expressed by any [lay] witness, . . . you should consider his [or] her believability, the extent of his or her opportunity to perceive the matters upon which his or her opinion is based and the reasons, if any, given for it."

In addition to these standard evidentiary instructions, the trial court instructed the jury on how to evaluate the credibility of expert witnesses. CALJIC No. 2.80 informed the jury that, "[i]n determining what weight to give any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or material upon which each opinion is based, and the reasons for each opinion." CALJIC No. 2.83 likewise advised that, "[i]n resolving any conflict that may exist in the testimony of expert witnesses, you should weigh the opinion of one expert against that of another" by considering "the qualifications and believability of each witness, the reasons for each opinion, and the matter upon which it is based." The overall charge to the jury thus made clear that the jurors were the exclusive judges of the credibility of witnesses and the weight to be given the testimony of each witness.

Here, the central factual issue before the jury was whether Kye's death was the result of an accidental fall or abusive head trauma. Because Hoffman did not testify at trial and no one else was present when Kye sustained his fatal injuries, there were no percipient witnesses who could describe how those injuries occurred. Instead, the principal evidence before the jury on the cause of Kye's death was the testimony provided by the medical experts. As Hoffman acknowledges, the jury was instructed specifically on the factors to consider in weighing the opinions of the expert witnesses and resolving any conflicts in their testimony with CALJIC Nos. 2.80 and 2.83. Hoffman

18

nevertheless asserts that the lay witness testimony also may have contributed to the jury's verdict because it supported the theory that he had a propensity for child abuse based on the witnesses' observations that Kye had sustained prior injuries while in Hoffman's care. However, the instructions that were given by the trial court adequately informed the jury how to evaluate the testimony of both lay and expert witnesses. Based on these instructions, the jury was aware that it should evaluate the credibility of each percipient witness by considering such factors as prior consistent or inconsistent statements made by the witness, discrepancies in his or her testimony, and the convincing force of the testimony given. The jury also was aware that, in weighing the opinions of the percipient witnesses about the suspicious nature of Kye's prior injuries, it should consider each witness's believability, the extent of his or her opportunity to perceive how those injuries occurred, and the reasons for any belief that those injuries were inflicted by Hoffman.

Moreover, during closing arguments, both the prosecution and the defense reminded the jury of its exclusive role in judging witness credibility. Defense counsel told the jurors that "[y]ou're the impartial judges of the facts," and that "you're the one that decides what is true and what is false." The prosecutor advised the jurors that it was their duty to "evaluate witnesses," and that they were "the only judges of the believability of the witnesses." The prosecutor also explained that, in evaluating the percipient witness testimony about Kye's prior injuries, "it is up to you to decide the nature of how those were inflicted" and "whether there is enough evidence that the defendant inflicted those injuries."

Based on the instructions as a whole, the argument of counsel, and the evidence presented at trial, it is not reasonably probable that Hoffman would have obtained a more favorable result at trial had CALJIC No. 2.20 been given. Contrary to Hoffman's contention, the omission of the instruction did not constitute structural error requiring the reversal of his convictions, nor did it rise to the level of a federal constitutional violation. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1221 ["the lack of evidentiary instructions . . . [does] not constitute structural error"]; *People v. Carpenter* (1997) 15 Cal.4th 312, 393, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008)

19

43 Cal.4th 1096, 1106 ["[m]ere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution"].) The failure to instruct the jury with CALJIC No. 2.20 was therefore harmless.

### C. Failure to Instruct the Jury with CALJIC No. 2.27

Hoffman further argues that the trial court erred in failing to sua sponte instruct the jury on the testimony of a single witness with CALJIC No. 2.27. He also asserts that the error was prejudicial because his version of events about the cause of Kye's death was supported by the testimony of a single expert witness, which, if believed by the jury, could have resulted in an acquittal.

CALJIC No. 2.27, entitled "Sufficiency of Testimony of One Witness," states in pertinent part: "You should give the [uncorroborated] testimony of a single witness whatever weight you think it deserves. Testimony concerning any fact by one witness, which you believe, . . . is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends." CALJIC No. 2.27 "focuses on how the jury should evaluate a fact . . . proved solely by the testimony of a single witness. It is given with other instructions advising the jury how to engage in the *fact-finding* process." (*People v. Gammage* (1992) 2 Cal.4th 693, 700.) Contrary to the Attorney General's claim, however, the language of CALJIC No. 2.27 does not apply solely to prosecution witnesses. (*People v. Turner* (1990) 50 Cal.3d. 668, 696 [rejecting argument that CALJIC No. 2.27 does not apply to defense witnesses].) Instead, the trial court has a sua sponte duty to give the instruction "'in *every* criminal case in which no [independent] evidence [corroborating a single witness] is required. . . .'" (*Ibid*.; see also *People v. Rincon-Pineda*, *supra*, 14 Cal.3d at p. 885 [single-witness instruction "should be given in every criminal case in which no corroborating evidence is required"].)

In this case, the principal evidentiary conflict was between the five medical experts presented by the prosecution and the one medical expert presented by the defense concerning the cause of Kye's death. Because Hoffman offered the testimony of a single expert witness, Dr. Gabriel, to support his claim that Kye's fatal injuries were caused by

20

an accidental fall rather than abusive head trauma, the trial court erred in failing to instruct the jury with CALJIC No. 2.27. However, based on the totality of the record, we conclude that the erroneous omission of CALJIC No. 2.27 was harmless.

First, the other evidentiary instructions given by trial court sufficiently informed the jury how to evaluate expert witness testimony, including the testimony of the single expert presented by the defense. As discussed, CALJIC Nos. 2.80 and 2.83 instructed the jury on the factors to consider "[i]n determining what weight to give any opinion expressed by an expert witness" and "[i]n resolving any conflict that may exist in the testimony of expert witnesses." CALJIC No. 2.80 also explained that the jury was "not bound by an opinion" of an expert and should "[g]ive each opinion the weight you find it deserves." CALJIC No. 2.22 advised the jury that it was "not required to decide any issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which you find more convincing." CALJIC No. 2.22 further cautioned the jury: "You must not decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. The final test is not in the relevant number of witnesses, but in the convincing force of the evidence." Based on these instructions, the jury was informed that Dr. Gabriel's status as the sole defense expert did not preclude it from crediting his opinion over that of the prosecution's experts if it found his testimony more convincing. CALJIC No. 2.22, in particular, told the jury that "it is the convincing force of testimony, not the number of witnesses that is of critical importance." (*People v. Reyes* (2007) 151 Cal.App.4th 1491, 1497.)

Second, it was never suggested to the jury during closing arguments that an expert's opinion had to be corroborated by other experts before it could be credited. To the contrary, defense counsel told the jurors that they were not bound by the opinion of any expert, and argued that they should reject the opinions expressed by the prosecution's experts as speculative and unreasonable. Defense counsel also urged the jurors to credit Dr. Gabriel's testimony on the cause of Kye's death over that of the prosecution's experts because he was the only expert witness who specialized in pediatric neurology and had

21

reviewed Kye's complete medical history in rendering an opinion. While the prosecutor argued that Dr. Gabriel's testimony was flawed in many respects and should be rejected, she never advised the jury to weigh the evidence by comparing the number of experts presented by each side, or to disregard Dr. Gabriel's opinion merely because it was not supported by other defense experts.

Third, there was compelling evidence of Hoffman's guilt. At the time Kye was admitted to the hospital, he had multiple external bruises on both sides of his face and head, multiple subdural hemorrhages on both sides of his frontal skull, and massive retinal hemorrhaging in both eyes. There was no dispute that the injuries that caused Kye's death occurred a few hours prior to his admission to the hospital while he was alone in Hoffman's care. While Dr. Gabriel testified that Kye's death could have been caused by a single fall from a short distance, he stated that he could not offer an opinion as to whether the death was accidental or intentional. In contrast, there was consistent testimony from the prosecution's experts that Kye's fatal injuries were caused by non-accidental abusive head trauma. There was also strong evidence of consciousness of guilt. After Kye sustained an indisputably severe head injury, Hoffman did not seek emergency medical treatment for the child or even notify anyone that the child had been seriously injured. Instead, he fabricated a story about Kye falling off his toddler bed onto a toy alligator. He told that story to Jazmin in a text message and subsequent telephone call later that night while falsely reassuring her that Kye was fine. He then repeated that story to the police on several occasions and did not offer a different version of events until it was made clear to him that Kye's injuries were not consistent with his account. In his second version of events, Hoffman claimed that Kye had fallen off the adult-sized bed and landed awkwardly on the back of his head. However, there was no evidence of any injury to the back of Kye's head, and even Dr. Gabriel agreed that the child's injuries were not consistent with a single impact to the back of the head.

On this record, there was no reasonable probability that the jury would have returned a verdict more favorable to Hoffman had it received the single-witness instruction. Consequently, the omission of CALJIC No. 2.27 did not constitute reversible

error.  (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 393.)  In reaching this conclusion, we do not suggest that a failure to instruct the jury on how to evaluate certain evidence can never result in prejudice.  Although the omission of both CALJIC Nos. 2.20 and 2.27 were harmless in this case, we strongly caution the trial courts to ensure that each of the required evidentiary instructions is given.  As our Supreme Court has observed, "[t]he cost in time of providing such instructions is minimal, and the potential for prejudice in their absence surely justifies doing so."  (*People v. Carter*, *supra*, 30 Cal.4th at p. 1222.)

### D.    Instructing the Jury with CALJIC No. 2.04

Hoffman next contends that the trial court prejudicially erred in instructing the jury on his alleged efforts to fabricate evidence with CALJIC No. 2.04.  He claims the evidence was insufficient to support the instruction because the jury could not reasonably infer that he attempted to fabricate evidence concerning the cause of Kye's injuries.

The trial court instructed the jury with CALJIC No. 2.04 as follows:  "If you find a defendant attempted to or did fabricate evidence to be produced at the trial, that conduct may be considered by you as a circumstance tending to show a consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide."  As the Supreme Court has explained, the facts giving rise to an inference of consciousness of guilt need not be conclusively established before CALJIC No. 2.04 may be given.  (*People v. Coffman  and Marlow* (2004) 34 Cal.4th 1, 102.)  Instead, "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference."  (*Ibid*.)  Additionally, although the instruction refers to evidence to be produced at trial, "CALJIC No. 2.04 does not require judicial proceedings to actually be in progress when the attempt . . . to fabricate evidence is made.  It [is] sufficient that the jury could reasonably infer from the incident that [the] defendant . . . sought to fabricate evidence in anticipation of a trial."  (*People v. Rodriguez* (1994) 8 Cal.4th 1060, 1139.)

In this case, the prosecution presented sufficient evidence to support an inference that Hoffman attempted to fabricate evidence concerning the cause of Kye's injuries to

23

deflect culpability from himself.  When Detective Duval first interviewed Hoffman at the hospital, Hoffman told him that, after Kye fell off his toddler bed onto a toy, he collected all of the toys that were on the floor and put them away in a toy chest.  However, when Detective Duval conducted a search of the home later that day, he found a toy alligator on the floor next to Kye's bed.  In a follow-up interview with Detective Duvall, Hoffman then stated that he had taken the toy alligator out of the toy chest and placed it on the floor so that he could show the officers at the scene how Kye's fall occurred.  Hoffman continued to claim that Kye had fallen off his toddler bed onto the toy alligator.  It was not until several months later that Hoffman admitted that Kye never fell from his toddler bed and that he had fabricated the story about the toy alligator because he was afraid of being blamed for Kye's injuries.  From this evidence, the jury rationally could have inferred that Hoffman positioned the toy on the floor next to Kye's bed to support his false version of events about how the child was injured.[3]

Even assuming that the evidence was insufficient to support instructing the jury with CALJIC No. 2.04 based on Hoffman's conduct in placing the toy on the floor, any error in giving the instruction was harmless.  CALJIC No. 2.04 merely instructs "the jury to infer that a particular defendant had a consciousness of guilt only if that defendant had engaged in the described conduct.  Thus, if . . . the prosecution presented no evidence that [the defendant] tried to . . . fabricate evidence, and no evidence that he authorized anyone

---

[3]    Contrary to Hoffman's claim on appeal, it is not clear from Detective Duval's testimony or Hoffman's recorded interview that Hoffman took out the toy alligator and placed it on the floor in the presence of the officers.  At trial, Detective Duval testified that Hoffman had told him that he took the toy alligator out of the toy chest, placed it on the floor, and directed the officers to the toy to show them where Kye had fallen.   In his recorded interview with the detective, Hoffman said that he took the toy alligator out of the toy chest and showed the officers "more or less what I had seen."  Hoffman also told the detective, "[Q]uite a few of them wanted to see exactly what had happened . . ., so I just kind of – in a rush kinda just grabbed it and said, 'Okay.  It was kinda laying in this, um area, um, that I must've left behind like that."  Hoffman never explicitly stated whether he placed the toy alligator on the floor in the officers' presence, or did so privately and then directed the officers to the toy.

24

else to do so, we presume that the jury concluded that the instructions did not apply to him and it should not infer a consciousness of his guilt." (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 49; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1223 ["'"'[a]t worst, there was no evidence to support the instruction and … it was superfluous"'"'].)

Furthermore by the time of trial, it was undisputed that Hoffman had gone to considerable lengths to fabricate a story about the cause of Kye's injuries. As discussed, shortly after Kye was injured while in Hoffman's care, Hoffman sent a text message to Jazmin indicating that Kye had fallen off his toddler bed. He also sent her a photograph of a bruise forming on Kye's head, but did not disclose the severity of the child's head injury. Hoffman then falsely told Jazmin that night and for several months thereafter that Kye was injured when he fell off his toddler bed onto the toy alligator. Hoffman repeated that story to the police in three separate recorded interviews before finally admitting that it was a fabrication. He also admitted that he had lied to the police in the past because he was afraid of being blamed for Kye's injuries. Accordingly, apart from Hoffman's placement of the toy on the floor, there was ample evidence before the jury tending to show a consciousness of guilt. Hoffman has failed to show any prejudicial error in the giving of CALJIC No. 2.04.

### E. Instructing the Jury with CALJIC Nos. 2.50.04 and 9.37

Hoffman also asserts that the trial court committed prejudicial error in instructing the jury on evidence of other child abuse offenses with modified versions of CALJIC Nos. 2.50.04 and 9.37. Hoffman argues that these modified instructions erroneously allowed the jury to infer that he had a propensity to commit a crime of child abuse if it found that he committed prior acts of child abuse or neglect as defined in section 273a, rather than willful corporal punishment or injury on a child as defined in section 273d.

The admissibility of evidence concerning other child abuse offenses is governed by Evidence Code section 1109, subdivision (a)(3). It provides that "in a criminal action in which the defendant is accused of an offense involving child abuse, evidence of the defendant's commission of child abuse is not made inadmissible by Section 1101 if the

25

evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(3).) "Child abuse" for purposes of this subdivision is defined as "an act proscribed by Section 273d of the Penal Code." (Evid. Code, § 1109 subd. (d)(2).) Section 273d makes it a felony to "willfully inflict[] upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition . . . ." (§ 273d, subd. (a).) A "traumatic condition" has been defined as "'a condition of the body such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force.'" (*People v. Cockburn* (2003) 109 Cal.App.4th 1151, 1160; see also *People v. Gutierrez* (1985) 171 Cal.App.3d 944, 951, fn. 6; § 273.5, subd. (d).) The physical manifestation of a traumatic condition can be shown by bruising or redness. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1085; *People v. Wilkins* (1993) 14 Cal.App.4th 761, 771.)

At the close of the evidence in this case, the prosecutor asked the trial court to instruct the jury on evidence of other child abuse offenses. The prosecutor argued that there was circumstantial evidence that Hoffman had committed four "prior bad acts" against Kye, and that the jury should be allowed to determine by a preponderance of the evidence whether those acts occurred. Defense counsel objected to the instruction on the ground that there was insufficient evidence that Hoffman had committed any prior child abuse crimes. After conferring with counsel off the record, the trial court decided that it would give a modified version of CALJIC No. 2.50.04 that specifically informed the jury that the determination of whether Hoffman committed other child abuse offenses was a matter within its discretion. While preserving her objection to the instruction as a whole, defense counsel stipulated to the modified language.

Following a further discussion with counsel off the record, the trial court asked the prosecutor: "The other crimes you're alleging are child abuse crimes under [section] 273a(a)?"[4] The prosecutor answered, "Correct." The court then indicated that, after

---

[4]     Under section 273a, subdivision (a), "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any

26

reviewing the instruction on a violation of section 273a, subdivision (a) with both parties, it had "deleted everything relating to negligence" from the instruction at the request of the defense. The court asked defense counsel: "And with your initial objection to the instruction as a whole, that is, the other crimes and this, noted for the record, do we agree on this instruction?" Defense counsel responded, "Correct."

The trial court thereafter instructed the jury with a modified version of CALJIC No. 2.50.04, which provided, in relevant part: "You have heard evidence of prior injuries the victim has sustained. Whether or not these injuries were caused by the defendant are matters within your discretion to decide. You should consider all relevant evidence including whether the defendant committed any other child abuse acts, whether charged or uncharged, about which evidence has been received. The term 'child abuse' as used in this instruction means conduct that a person engages in that violates Penal Code section 273d. If you find by a preponderance of the evidence that the defendant committed a violation of Penal Code section 273d, you may, but are not required to, infer that the defendant has a disposition to commit another offense involving child abuse. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused."

A violation of section 273d was not defined in CALJIC 2.50.04 or elsewhere in the instructions. Instead, the jury was instructed on the definition of a violation of section 273a with CALJIC No. 9.37. The modified version of CALJIC No. 9.37 given by the trial court stated that "[e]very person who, under circumstances or conditions likely to produce great bodily harm or death, willfully inflicts unjustifiable physical pain or mental suffering on a child, or willfully causes or, permits a child to suffer unjustifiable physical pain or mental suffering, or has care or custody of a child and willfully causes the child's person or health to be injured, is guilty of a violation of Penal Code section 273a,

---

child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered," is guilty of a felony.

27

subdivision (a), a crime." The term "unjustifiable physical pain or mental suffering" was defined in the instruction as "pain or suffering which is not reasonably necessary or is excessive under the circumstances." The term "great bodily harm" was defined as a "significant or substantial injury." The instruction further provided that, "in order to prove this crime, each of the following elements must be proved: 1. A person willfully inflicted unjustifiable physical pain or mental suffering on a child; or 2. [A] person . . . had care or custody of a child and willfully caused the child to be injured."

On appeal, Hoffman does not challenge the trial court's decision to instruct the jury that it could infer a propensity to commit child abuse in accordance with CALJIC No. 2.50.04. He acknowledges that CALJIC No. 2.50.04 correctly informed the jury that "child abuse," as used in the instruction, "means conduct that a person engages in that violates Penal Code section 273d." Hoffman contends, however, that the trial court erred in giving CALJIC No. 9.37 because that instruction incorrectly defined "child abuse" for purposes of inferring propensity as an act proscribed by section 273a rather than section 273d. Hoffman further claims that the error was prejudicial because it allowed the jury to infer that he had a propensity to commit child abuse if it found that Kye's prior injuries while in Hoffman's care were caused by mere negligence.

We conclude that the trial court erred in instructing the jury on evidence of other child abuse offenses. As discussed, the Evidence Code expressly limits the admissibility of prior child abuse crimes to support a propensity inference to "an act proscribed by [s]ection 273d." (Evid. Code, § 1109, subd. (d)(2).) In requesting that a propensity instruction be given in this case, however, the prosecutor did not allege that any of the prior child abuse crimes committed by Hoffman were violations of section 273d. Rather, when asked by the trial court, the prosecutor affirmed that the other child abuse offenses being alleged by the People were "child abuse crimes under [section] 273a(a)." Because the prosecutor never contended that Hoffman had committed a violation of section 273d, defense counsel's objection to the propensity instructions as a whole should have been sustained. We conclude, however, that the trial court's error in giving the propensity

28

instructions with a modified definition of a violation of section 273a was harmless under the circumstances of this case.[5]

Sections 273a and 273d "have been described as 'related statute[s].'" (*People v. Sargent* (1999) 19 Cal.4th 1206, 1219). Section 273d, subdivision (a) proscribes the willful infliction of corporal punishment or injury on a child resulting in a traumatic condition, which includes both minor and serious injuries. (*People v. Cockburn*, *supra*, 109 Cal.App.4th at p. 1160.) Section 273d does not require "'a deliberate intent to cause a traumatic condition, but only the more general intent to inflict upon a child any cruel or inhuman corporal punishment or injury.'" (*People v. Sargent*, *supra*, at p. 1220.) Section 273a, subdivision (a) "proscribes essentially four branches of conduct" consisting of (1) willfully inflicting unjustifiable physical pain or mental suffering on a child, (2) willfully causing or permitting a child to suffer unjustifiable physical pain or mental suffering, (3) willfully causing or permitting a child in one's care or custody to be injured, or (4) willfully causing or permitting a child in one's care or custody to be placed in an endangering situation. (*People v. Valdez* (2002) 27 Cal.4th 778, 783.) While the first category of conduct is a general intent crime, the mens rea for the other three categories is criminal negligence. (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1445.)

---

[5]     The Attorney General argues that Hoffman invited the alleged instructional error because his trial counsel requested the modification to CALJIC No. 9.37 about which he now complains. We disagree. While some of the discussion about the instruction was held off the record, it is clear that defense counsel objected to the jury receiving any instruction on evidence of other child abuse offenses, and only agreed to the modified language in CALJIC No. 9.37 after the trial court ruled that it would give a propensity instruction. The record also reflects that the prosecutor specifically informed the trial court that the other child abuse offenses alleged by the People were crimes under section 273a. There is no indication in the record that the defense requested that the alleged prior offenses be defined as acts proscribed by section 273a rather than section 273d, or that the application of 273d was ever addressed by the parties or the court. On this record, defense counsel's objection to the propensity instructions as a whole was sufficient to preserve the issue for appeal. (*People v. Moon* (2005) 37 Cal.4th 1, 29, fn. 4 [rejecting invited error claim where "defense counsel merely acquiesced to the instruction, and the record does not show whether counsel's decision was a tactical one"].)

Although there is no requirement that a child actually suffer a great bodily injury, section 273a, subdivision (a) is "'"intended to protect a child from an abusive situation in which the probability of serious injury is great."'" (*People v. Valdez*, *supra*, at p. 784.)

In giving CALJIC No. 9.37, the trial court did not instruct the jury on each of the four categories of conduct proscribed by section 273a. Instead, the trial court modified the instruction to remove from the jury's consideration evidence of negligent conduct toward a child that did not involve a direct infliction of harm. As modified, CALJIC No. 9.37 limited a violation of section 273a to "willfully inflict[ing] unjustifiable physical pain or mental suffering on a child," or "hav[ing] care or custody of a child and willfully caus[ing] the child to be injured." The effect of these modifications was to make the mens rea for the conduct proscribed by section 273a, as set forth in the instruction, substantially similar to the mens rea for the conduct proscribed by section 273d. It is true, as Hoffman points out, that the trial court failed to excise every reference related to negligence from the version of CALJIC No. 9.37 that was given to the jury. The term "willfully," for instance, continued to be defined in the instruction as "with a purpose or willingness to commit the act or make the omission in question." However, when the modified instruction is considered as a whole, it did not permit the jury to infer a propensity for child abuse merely by finding that Kye had been injured in the past due to Hoffman's negligence. Instead, it required the jury to find that Hoffman intentionally had caused the child's prior injuries.

Consistent with the modified version of CALJIC No. 9.37 that was given by the trial court, both the prosecutor and the defense counsel informed the jury during closing arguments that it could only infer that Hoffman had a propensity to commit child abuse if it found that he had inflicted Kye's prior injuries. In describing the prior injuries that Kye had sustained while in Hoffman's care, the prosecutor told the jury, "[I]t is up to you to decide the nature of how those were inflicted" and "whether there is enough evidence that the defendant inflicted those injuries." The prosecutor also explained that the jury had heard evidence of "four different instances where Kye turned up injured when the defendant was watching him," and that if the jury found by a "preponderance of the

30

evidence . . . that the defendant inflicted those, [it] could use that evidence to say that he has a propensity for hitting Kye." Although defense counsel did not specifically address the propensity instructions in her closing argument, she did assert that the prior injuries suffered by Kye were not consistent with physical abuse and noted that the child had sustained similar bumps and bruises while in the care of Jazmin and her family. Defense counsel also told the jury, "You can't say that every time an injury happened in [Hoffman's] care it's intentional, but if it happened with somebody else, it's not intentional. You can't say that." The arguments of both counsel made clear that the jury had to find that Hoffman intentionally inflicted the prior injuries before it could infer from such evidence that he had a propensity to commit child abuse.

Moreover, based on the evidence presented at trial, the prior injuries that Kye sustained while in Hoffman's care consisted of suspicious bruises on his face and thigh and a cut on his lip. If the jury had been instructed on a violation of section 273d with CALJIC No. 9.36, as was required, it would have been informed that "an injury resulting in a traumatic condition" includes any "wound or external or internal injury, whether of a minor or a serious nature, caused by a physical force." A properly instructed jury thus could have inferred a propensity for child abuse if it found that Hoffman willfully inflicted any prior physical injury on Kye, even if such injury was minor in nature. The modified version of CALJIC No. 9.37 that was given by the trial court similarly allowed the jury to infer a propensity for child abuse if it found that Hoffman willfully caused Kye to be injured in the past, but also required the jury to find that such injury occurred under circumstances that were likely to produce great bodily harm. Given this language, there is no reasonable probability that the jury could have reached a result more favorable to Hoffman if it had been instructed with CALJIC No. 9.36 rather than the modified version of CALJIC No. 9.37 that was provided in this case.

Finally, as discussed, there was ample evidence that the fatal injuries suffered by Kye while in Hoffman's care were the result of abusive head trauma. Kye's head injuries were devastating in nature and were described by the child's attending physician as among the most severe she had ever seen. Each of the prosecution's medical experts

31

similarly testified that the injuries were consistent with multiple blunt force trauma inflicted by another, and were not consistent with a single impact fall from a height of one to three feet. It was undisputed that Hoffman did not seek immediate medical aid for Kye after the child was seriously injured, and he later repeatedly lied to the police about how the injuries occurred. Based on the totality of the record, the error in instructing the jury on evidence of other child abuse offenses was harmless.

## II.     Denial of Motion for a New Trial

Hoffman contends that the trial court violated his constitutional rights when it denied his motion for a new trial. Hoffman specifically claims that he was entitled to a new trial based on newly discovered evidence that Dr. Minckler, the prosecution's eye pathology expert, sought the payment of expert witness fees after the trial concluded.

### A.     Relevant Background

At trial, Dr. Minckler testified that he found extensive retinal hemorrhaging as well as evidence of retinal detachment in both of Kye's eyes, and that the child's eye injuries were consistent with non-accidental head trauma. On redirect examination, the prosecutor asked him, "Dr. Minckler, our office didn't pay you any money to come here, right?" Dr. Minckler replied, "No, unfortunately."

On April 7, 2014, the prosecutor informed both the trial court and defense counsel in writing that, after the trial had concluded, Dr. Minckler submitted a $1,275 bill to the District Attorney's office for 4.25 hours of work, consisting of 2.25 hours of travel time, 0.5 hours in a pretrial meeting with the prosecutor, and 1.5 hours of trial testimony. In a subsequent telephone call with the prosecutor, Dr. Minckler explained that, when he examined Kye's eyes at the request of the coroner's office, he was on salary at the University of California at Irvine; however, he had since retired and now charged $300 per hour for his time. Dr. Minckler also indicated that he was willing to waive his fee altogether in this case. The prosecutor advised the trial court and defense counsel that the her office had decided to reimburse Dr. Minckler for his travel time only.

On April 9, 2014, the trial court held a hearing on a written motion for a new trial filed by Hoffman. At that time, defense counsel orally requested that the newly disclosed evidence regarding Dr. Minckler's fee be added as an alternative ground for the motion. Defense counsel pointed out that Dr. Minckler had testified that "he was not going to be paid knowing that he was the one that was going to submit the order for payment." The trial court noted that, when Dr. Minckler performed his eye pathology analysis, "he was an employee for U.C.I., which, apparently was the medical facility that was contracted out by the coroner's office to handle these examinations." The court then stated: "So I think it could simply have been a misunderstanding. . . . I'm going to deny the motion for new trial. I don't believe that it was a material fact that affected the jury's decision whether or not he was paid. . . . And in the end, he's not getting paid. He's getting reimbursed for mileage, which . . . we would do for any witness."

## B.  Standard of Review

The trial court may order a new trial when "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at trial." (§ 1181, subd. 8.) "'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" [Citations.]' [Citation.]" (*People v. Howard* (2010) 51 Cal.4th 15, 43.) "'In addition, "the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable." [Citation.]' [Citation.]" (*Ibid.*) The trial court's decision to deny a new trial motion based on newly discovered evidence is reviewed for an abuse of discretion. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.) Indeed, "'"[t]he determination of a motion for a new trial rests so completely within the

33

court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1210.)

## C.    The Trial Court Properly Denied the Motion for a New Trial

In this case, the trial court did not abuse its discretion in denying Hoffman's motion for a new trial because it is not reasonably probable that the newly discovered evidence concerning Dr. Minckler's post-trial fee request would lead to a different result on retrial. As Hoffman acknowledges, there was no evidence that Dr. Minckler expected to be provided with a certain sum of money from the District Attorney's office when he rendered an expert opinion on the cause of Kye's injuries. At the time he performed his eye pathology analysis for the coroner's office, he was employed by the University of California at Irvine and did not expect to receive any payment for his work other than his regular salary. Dr. Minckler accordingly had no financial incentive to render an opinion favorable to the prosecution when he concluded in his report that Kye's eye injuries were consistent with non-accidental head trauma. In addition, Dr. Minckler's opinion about the cause of Kye's death was consistent with the opinions offered by the prosecution's four other medical experts, each of whom received no more than his or her regular salary in connection with their testimony.

Moreover, there is no evidence that Dr. Minckler ever received any compensation from the District Attorney's office for his testimony at trial other than reimbursement for his travel time. Indeed, when the prosecutor contacted Dr. Minckler about his fee request, he told her that "he did not care if he got paid in this case" and "asked [her] to tear up the bill." While a jury on retrial would hear that Dr. Minckler had submitted a bill to the District Attorney's office in anticipation of being compensated for his time, it also would hear that he had expressed a willingness to forego any payment of fees. Under these circumstances, the newly discovered evidence that Dr. Minckler's sought payment for his expert witness testimony could not have "render[ed] a different result probable on a retrial." (§ 1181, subd. 8.) The trial court accordingly did not abuse its discretion or violate Hoffman's constitutional rights in denying the new trial motion.

**DISPOSITION**

The judgment is affirmed.


ZELON, Acting P.J.


We concur:


SEGAL, J.


BECKLOFF, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.